Thomas J. Polis, Esq. - SBN 119326
**POLIS & ASSOCIATES**
**A PROFESSIONAL LAW CORPORATION**
19800 MacArthur Boulevard, Suite 1000
Irvine, California 92612-2433
Telephone: (949) 862-0040
Facsimile: (949) 862-0041
E-Mail: tom@polis-law.com

Special Litigation Counsel for Debtors,
Santa Cruz Berry Farming Company, LLC and Corralitos Farms, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>Santa Cruz Berry Farming Company, LLC,<br><br>Debtor.<br><br>Affects:<br><br>☐ All Debtors<br>☒ Corralitos Farms, LLC | Case No. 5:15-bk-51771<br><br>Jointly Administered with: 5:15-bk-51772, In re Corralitos Farms, LLC<br><br>Chapter 11<br><br>DEBTOR-IN-POSSESSION CORRALITOS FARMS' MOTION FOR ORDER PURSUANT TO LOCAL BANKRUPTCY RULE 6004 RE: (1) APPROVING SALE AND BID PROCEDURES AND EXPENSE REIMBURSEMENT IN CONNECTION WITH PROPOSED SALE OF THE DEBTOR'S BANKRUPTCY ESTATE AND (2) SETTING HEARING ON MOTION FOR SALE OF THE DEBTOR'S MEMBERSHIP INTEREST IN K&M ENTERPRISES, LLC; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>**Filed and Served Concurrently Herewith:**<br><br>1. Declaration of Robert Fritz Koontz;<br>2. Notice of Hearing; and<br>3. Certificate of Service.<br><br>**Hearing:**<br>Date: December 3, 2015<br>Time: 10:30 a.m.<br>Judge/ Hon. M. Elaine Hammond<br>Place: U.S. Courthouse<br>280 South First Street<br>Courtroom 3020<br>San Jose, CA 95113 |

**TABLE OF CONTENTS**

I. STATEMENT OF FACTS .................................................. 5
   A. Brief Description of the Debtor's Business Operations and Events
      Precipitating Chapter 11 Filing ............................... 5
   B. Secured Debt ................................................ 6
   C. Need for a Prompt Sale ...................................... 6
   D. Debtor's Marketing Efforts .................................. 7
   E. Proposed Sale .............................................. 7

II. PROPOSED SALE PROCEDURES, NOTICE OF SALE, AND BREAK-UP
    FEE AND EXPENSE REIMBURSEMENT FEE ........................ 7
   A. Auction ..................................................... 7
   B. Participation Requirements .................................. 7
   C. Qualified Overbid ........................................... 7
   D. Purchased Assets ............................................ 8
   E. Auction Process ............................................. 9
   F. The Successful Bid and the Back-Up Bidder ................... 9
   G. Acceptance of Qualified Overbid ............................. 9
   H. Break-Up Fee and Expense Reimbursement ...................... 9
   I. K&M Enterprises First Right of Refusal ...................... 10
   J. Other Provisions ............................................ 10
   K. Acknowledgment .............................................. 10
   L. Discretion .................................................. 10
   M. Rejection of Bids ........................................... 10
   N. Jurisdiction to Resolve Disputes ............................ 11
   O. Enforcement ................................................. 11
   P. Notice of Sale .............................................. 11
   Q. Sale Hearing ................................................ 11
   R. Objections to the Sale Motion ............................... 11

III. GOOD CAUSE EXISTS TO APPROVE THE SALE PROCEDURES ....... 12

IV. THE BREAK-UP FEE AND THE EXPENSE REIMBURSEMENT SHOULD
    BE APPROVED ................................................... 13

V. CONCLUSION ...................................................... 15

**TO THE HONORABLE M. ELAINE HAMMOND, U.S. BANKRUPTCY JUDGE; THE CREDITORS' COMMITTEE FOR THE RELATED DEBTOR AND ITS COUNSEL OF RECORD; THE OFFICE OF THE U.S. TRUSTEE; AND OTHER PARTIES ENTITLED TO NOTICE**:

Debtor and Debtor-In-Possession, Corralitos Farms, LLC ("Debtor" or "Corralitos"), hereby moves ("*Motion*") this Court, for an order: (i) approving sale and bid procedures, break-up fee and expense reimbursement in connection with proposed sale of Debtor's 4% membership interest in K&M Enterprises; (ii) approving the form and manner of the sale notice; (iii) scheduling an auction and sale; (iv) scheduling certain deadlines; and (v) approving procedures for determining cure costs. The Debtor proposes to sell its 4% minority membership interest in K&M Enterprises, LLC ("K&M"), subject to overbid, and subject to the right of first refusal for K&M. Moreover, as requested by the Office of the United States Trustee, the Debtor and its principals will have no business, family, economic, or other written or unwritten relationship with the Stalking Horse Bidder, or any insider of the Stalking Horse Bidder. In order to maximize value in this case, the Debtor seeks to sell at auction, the K&M Membership interest. In order to ensure a fair and efficient auction, the Debtor seeks to establish uniform sale and bid procedures with which all interested parties must comply in order to purchase the Debtor's K&M Membership interest. ("Sale Procedures").

This *Motion* is based upon the within memorandum of points and authorities, the Declaration of Robert Fritz Koontz ("Koontz Declaration") appended hereto, all pleadings, papers and records on file with the Court and such other evidence, oral or documentary, as may be presented to the Court at the hearing on the *Motion*.

///
///
///
///
///
///

1     **WHEREFORE**, the Debtor prays that the Court enter an order:  (i) approving the proposed sale and bid procedures, break-up fee and expense reimbursement; (ii) approving the notice of the bid deadline, auction, sale hearing; (iii) scheduling a hearing on the sale of Purchased Assets ("Sale") within twenty-one days; (iv) scheduling certain deadlines; and (such additional relief as the Court deems just and proper.

DATED: October 15, 2015           **POLIS & ASSOCIATES**
                                                 **A PROFESSIONAL LAW CORPORATION**

                                             **By:**      /s/ Thomas J. Polis
                                                         **Thomas J. Polis, Esq.**
                                                         **Special Litigation Counsel for Debtors, Santa Cruz Berry Farming Company, LLC and Corralitos Farms, LLC**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.  BRIEF DESCRIPTION OF THE DEBTOR'S BUSINESS OPERATIONS AND EVENTS PRECIPITATING CHAPTER 11 FILING**

1.  In or about January 2001, Debtor Corralitos Farms, through its principals acquired a 4% minority non-management membership interest in K&M Enterprises, LLC. The January 2001 K&M Operating Agreement included various negative convenants between K&M and its members, including restrictions that prohibit encumbering and transferring a member's interest in K&M Enterprises (*See*, Section 3:10 of the *January 2001 K&M Operating Agreement*).

2.  On or about May 22, 2015, K&M Enterprises, through its managing member, Ed Kelly made direct demand on the Debtor's principal, Robert Fritz Koontz to comply with the restrictive buy/sell provisions of the executory *January 2003 K&M Buy/Sell Agreement*, specifically, the restrictive provisions of a transfer of a members' interest. The Debtor, through its principal rejected K&M Enterprises' demands to exercise its right of first refusal remedies under the executory *January 2003 K&M Buy/Sell Agreement*.

3.  On May 25, 2015, Debtor Corralitos Farms, LLC, and its related entity, Santa Cruz Berry Farming Company, LLC filed their Voluntary Chapter 11 Bankruptcy Petitions in the above-captioned Bankruptcy Court.

4.  Soon after the Debtor's May 25, 2015 Bankruptcy filing K&M Enterprises, again through its principal demanded that the Debtor comply with the negative convenants of the executory *January 2003 K&M Buy/Sell Agreement*. The Debtor again rejected K&M Enterprises' demands under the *January 2003 K&M Buy/Sell Agreement*. (*See*, Paragraph 10 of the concurrently filed Declaration of Robert Fritz Koontz).

5.  Soon thereafter on June 17, 2015, Debtor Corralitos' bankruptcy case, along with Santa Cruz Berry's bankruptcy case were jointly administered (ECF No. 35, *Order re Joint Administration*).

6. In conjunction with the Debtor's fiduciary duties to its bankruptcy estate and Section 1106, et seq. of the Bankruptcy Code, the Debtor's principals and advisors believe the best option to maximize the Debtor's economic value of its K&M Enterprises' membership interest is to solicit the highest and best bids to assume and assign its 4% minority non-management membership interest therein. A primary hurdle preventing the Debtor from achieving that objective is to immediately reject the executory *January 2003 K&M Buy/Sell Agreement*.

7. On August 13, 2015, the Court ordered that the Debtor can reject the January 2003 K&M Buy/Sell Agreement, yet also allow K&M the "Right of First Refusal".

**B.  SECURED DEBT**

No less than three creditors assert liens against the Debtor's 4% membership interest in K&M, and assert security interest in the Debtor's 4% membership interest in K&M.

**C.  NEED FOR A PROMPT SALE**

As described in the Koontz Declaration, the Debtor is facing severe liquidity constraints and does not have the financial wherewithal to operate its business through a prolonged Chapter 11 process. The Debtor has determined that the value of its 4% membership interest in K&M would be preserved and maximized through a quick sale. Accordingly, a prompt sale of substantially all of the Debtor's 4% membership interest in K&M is essential to a successful result in this case. The sale of the Purchased Assets is subject to the proposed auction process and, ultimately, this Court's approval.

On August 13, 2015, the Court ordered that the Debtor can market and sell its 4% membership interest in K&M free and clear of the restrictive language in the January 2003 K&M Buy/Sell Agreement, yet allowing K&M to match the highest bid obtained by the Debtor subject to any breakup fee that K&M would have to pay (Stalking Horse Bidder is not the successful bidder).

///

///

///

D.  **DEBTOR'S MARKETING EFFORTS**

The Debtor's representatives have had initial discussions with potential bidders and a Stalking Horse Bidder to purchase the Debtor's 4% membership interest in K&M. Once the confidentiality agreements are signed, the potential bidders will presumably submit written offers.

E.  **PROPOSED SALE**

The Debtor believes that a prompt sale of its 4% membership interest critical to yield the highest return to its creditors. The Purchased Assets includes only the Debtor's 4% membership interest in K&M.

II.

**PROPOSED SALE PROCEDURES, NOTICE OF SALE AND BREAK-UP FEE, AND EXPENSE REIMBURSEMENT**

In order to create a fair, orderly and competitive process for the bidding of the 4% membership interest in K&M, the Debtor proposes and the Stalking Horse Bidder requests that the Court establish and approve the following sale procedures, break-up fee and expense reimbursement, deadlines and form and manner of notice described herein ("Sale Procedures").

A.  **Auction.** The auction (the "Auction") for the sale of the Purchased Assets shall take place at the above-captioned Court at 10:30 a.m. on January ____, 2016.

B.  **Participation Requirements.** Only a bidder that submits a bid that meets the criteria of a Qualified Bid as set forth in paragraph C and is deemed by the Debtor, in the exercise of its reasonable business judgment, to be financially able to consummate the purchase of the Purchased Assets ("Qualified Bidder") may participate at the Auction. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, and the opening bid by the Stalking Horse Bidder of $[TBA] shall be deemed the Stalking Horse Bid.

C.  **Qualified Overbid.** For any bidder other than the Stalking Horse Bidder to be eligible for the Auction as a Qualified Bidder, that bidder must submit a Qualified Overbid, which must include, among other things, the following items and meet the following criteria:

  1. A confidentiality agreement in a form and substance acceptable to the Debtor, and Stalking Horse Bidder;

  2. A good faith deposit (a "Deposit"), in the form of a bank cashier's check or other form of immediately available funds, in the amount of $[TBA], payable to

the order of the Debtor, and submitted to the Debtor not later than the "Bid Deadline" (as defined in paragraph C(8), below), which Deposit shall be held in a segregated escrow account;

3. A competing purchase price that provides for aggregate consideration in cash to the Debtor of at least $[TBA] plus reasonable expenses of the Stalking Horse Bidder's professionals more than the Purchase Price (as defined above and in the Term Sheet) offered by the Stalking Horse Bidder (the "Expense Reimbursement");

4. Written acknowledgment that, if the Court enters an order authorizing a sale to the Qualified Bidder, such Deposit shall be used, without further authorization or action by such Qualified Bidder, to acquire the Purchased Assets;

5. An executed copy of an asset purchase agreement with substantially the same material terms and conditions as are contained in the Term Sheet, and the corresponding Asset Purchase Agreement ("APA") which will be provided to such Qualified Bidder, marked with such other changes as the prospective bidder considers necessary to proceed with the purchase of the Purchased Assets (collectively, a "Marked Agreement"), which agreement shall not be subject to termination except on the same terms as provided in the Term Sheet and shall not be conditioned upon the outcome of any unperformed due diligence by the bidder, the receipt of equity or debt financing, or the approval of any board of directors, shareholder, or other corporate approval;

6. Be accompanied by relevant financial and other information for the prospective bidder to enable the Debtor, after consultation with the Stalking Horse Bidder, to determine such prospective bidder's creditworthiness, ability to close a sale of the Purchased Assets, and ability to provide adequate assurance of future performance under any executory contracts to be assumed and assigned;

7. Not include or request a break-up fee, termination fee, expense reimbursement or similar type of payment; and

8. The bid package must be delivered to the Debtor's proposed general insolvency counsel, addressed to Thomas J. Polis, Esq., of Polis & Associates, A Professional Law Corporation, at 19800 MacArthur Boulevard, Suite 1000, Irvine, California 92612, so that it is received by no later than one (1) business day prior to the Auction, at 12:00 p.m. prevailing Pacific Time ("Bid Deadline"), although parties interested in bidding are strongly encouraged to become a Qualified Bidder as soon as possible. The Debtor shall, within three (3) business day of receiving any bid package, provide copies of such bid packages to the Stalking Horse Bidder. All bids are irrevocable until the earlier to occur of the closing (in accordance with the APA) and thirty (30) days from the entry of the order authorizing the sale of the Purchased Assets ("Sale Order").

D. **Purchased Assets.** The Debtor shall only offer for sale the Purchased Assets (Debtor's 4% membership interest in K&M) as a whole, subject to the withdrawal of any assets in which a Lender asserts an interest at such Lender's sole and exclusive option, and the Debtor shall not accept any bid package for less than all of the Purchased Assets.

E. **Auction Process.** To bid on the Purchased Assets, each Qualified Bidder or its authorized representative must attend the Auction in person. The Debtor will

determine prior to the Auction, in its sole discretion, which of the Qualified Overbids they received is the highest and best bid ("Opening Bid"). All bids subsequent to the Opening Bid must provide for aggregate consideration in cash to the Debtor that exceeds the Opening Bid by not less than [$TBA] ("Initial Overbid") and all bids subsequent to the Initial Overbid must exceed the amount of the prior offer by not less than $[TBA], provided, that the Stalking Horse Bidder shall have the right to make subsequent bids that match bids made by any Qualified Bidder and in such event, the Stalking Horse Bidder's matching bid shall be deemed the highest and best bid for the Purchased Assets. Bidding at the Auction shall continue until the highest or otherwise best Qualified Bid ("Successful Bid") is determined by the Debtor.

All bids must be made on the record in the presence of all Qualified Bidders. If the Debtor values any non-cash consideration (for the avoidance of doubt, a credit bid is considered cash consideration) in connection with any bid, the Debtor must describe and ascribe a value for such non-cash consideration in writing disclosed to all Qualified Bidders. The Debtor may announce at the Auction additional procedural rules for conducting the Auction as the Debtor deems to be in the best interests of the Debtor's bankruptcy estate. The bidder making the Successful Bid ("Successful Bidder") shall have one (1) business day following the selection of the Successful Bid by the Debtor to post additional funds so that the Deposit supporting the Successful Bid shall be in an amount equal to 10% of the amount of the Purchase Price of the Successful Bid.

F. **The Successful Bid and the Back-Up Bidder.** The Debtor shall file with the Court prior to the hearing on the Sale results of the Auction, including identification of the highest or otherwise best bid ("Successful Bidder"). The sale hearing may be adjourned or continued at the Debtor's discretion and the Court's schedule. The Debtor will also seek approval of the next highest or otherwise best bid from a Qualified Bidder to be the back-up bid and purchaser ("Back-Up Bidder"), in the event that the Successful Bidder fails to consummate the sale of the Purchased Assets. The Stalking Horse Bidder shall not be required to serve as a Back-Up Bidder. The Debtor reserves the right to hold the Deposit of the Back-Up Bidder until the earlier of the closing of the sale of the Purchased Assets and thirty (30) days after the entry of the Sale Order. The Deposits of all Qualified Bidders other than the Successful Bidder and the Back-Up Bidder will be returned within five (5) business days after the Auction. Nothing shall impair the Debtor's right, however, to retain such Deposit or a portion thereof under applicable non-bankruptcy law, provided, however, the Debtor files with the Court and serves notice on any affected bidder no later than the expiration of such five business day period any intent to exercise such rights. If the Successful Bidder fails to consummate the sale of the Purchased Assets, the Debtor may consummate the sale with the Back-Up Bidder, which shall then become the Successful Bidder, without further hearing or approval by the Court, and the Back-Up Bidder shall be obligated to Close.

G. **Acceptance of Qualified Overbid**. No Qualified Overbid shall be accepted by the Debtor unless and until the Court has entered the Sale Procedures Order.

H. **Break-Up Fee and Expense Reimbursement.** Upon the close of an alternative transaction for the Purchased Assets by a Successful Bidder, the Debtor shall pay to the Stalking Horse Bidder a break-up fee equal to 3% of the Purchase Price ("Break-up Fee"), plus the Expense Reimbursement for the reasonable expenses of the Stalking Horse Bidder's professionals. The Stalking Horse Bidder shall receive credit for the amount of the Break-up Fee and Expense Reimbursement

in each successive round of bidding in which the Stalking Horse Bidder participates.

I. **K&M Enterprises' First Right of Refusal.** Pursuant to the Court's August 13, 2015 Order, K&M retains its Right of First Refusal to match any Stalking Horse Bidders or Over Bidder.

J. **Other Provisions.**

1. Any sale or other disposition of the Purchased Assets shall be without representations or warranties of any kind, nature or description by the Debtor, its agents or representatives other than as expressly set forth in the final asset purchase agreement. The Purchased Assets shall be transferred on an "As Is" and "Where Is" basis.

2. By accepting information from the Debtor ("Data"), the recipient acknowledges and agrees that the Data has been prepared to assist the recipient in making its own evaluation of the Purchased Assets and the Data does not purport to be all-inclusive or to contain all of the information that a bidder may desire. In all cases, bidders should conduct their own investigation and analysis of the Purchased Assets, conduct site inspections, and scrutinize all of the Data. The Debtor and its counsel are not making nor will they make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise, with respect to the Purchased Assets and with respect to the accuracy, reliability or completeness of any Data, except as expressly stated in a contract executed by the Debtor. The Debtor and its Insiders and their respective officers, directors and employees, affiliates and representatives, expressly disclaim any and all liability based on or relating or pertaining to any written or oral statements, financial information, projections, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise.

K. **Acknowledgment.** Each bidder, by submitting a bid for the Purchased Assets, shall be deemed to have read and understood the terms and conditions of the Sale Procedures and acknowledge and represent that the bidder: (i) is bound by these Sale Procedures; (ii) had an opportunity to inspect and examine the Purchased Assets and to review all pertinent documents and information with respect to the Purchased Assets prior to making its offer and that it relied solely on that review and upon its own investigation and inspection of the Purchased Assets in making its Bid; and (iii) is not relying upon any written or oral statements, representations, or warranties of the Debtor, its professionals, or the Debtor's other agents or representatives.

L. **Discretion.** The Debtor, at or before the Auction, may impose such other and additional terms and conditions as it may determine to be in the best interests of the Debtor, the Debtor's estate, creditors and other parties-in-interest, provided, that such other terms and conditions shall not be inconsistent with the terms and conditions contained in the Sale Order.

M. **Rejection of Bids.** The Debtor may reject any otherwise Qualified Bid (other than the Stalking-Horse Bid) that in its sole discretion it deems to be: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules or these Sale

Procedures; or (iii) contrary to the best interest of the Debtor, the estate and creditors. Such rejection may be made at any time prior to the Auction or the sale hearing.

N. **Jurisdiction to Resolve Disputes.** Any and all disputes related or pertaining to or resulting or arising from the marketing process, the Auction, the sale of the Purchased Assets, and/or the conduct of the Debtor, and/or any of the Debtor's professional advisors shall be adjudicated solely by the United States Bankruptcy Court. The submission of a bid shall constitute an express consent by the bidder to the exclusive jurisdiction of the Court for all such matters.

O. **Enforcement.** If any party shall seek to enforce or protect its rights under the sale Order or under any document or instrument executed and delivered in connection herewith in any action, suit, or other proceeding, including all bankruptcy cases and proceedings, the prevailing party shall be entitled to receive from the other party payment of its costs and expenses, including reasonable attorneys' fees incurred (whether such costs or fees are incurred before or after the commencement of the proceeding), including any and all appeals or petitions therefrom.

P. **Notice of Sale**. As sufficient notice of the Sale, the Sale Procedures and Sale Procedures Order, the time and place of the Auction, Sale Hearing, the objection deadline for the Sale Hearing, the potential assumption and assignment of executory contract(s) or unexpired lease(s) and any cure costs, and the objection deadline with respect thereto, the Debtor will provide within two (2) business days of the entry of the Sale Procedures Order, or as soon as reasonably practicable thereafter, to all persons and entities required by the Term Sheet and APA, the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedures, the Notice of the (A) Bid Deadline, Auction and Sale Hearing in Connection with the Sale of the Debtor's Purchased Assets.

Q. **Sale Hearing.** The hearing on the Sale shall take place on January __, 2016, at 10:30 a.m., prevailing Pacific Time, in Courtroom 3020 at 280 South First Street Courtroom 3020, San Jose, California 95113. Counsel for any interested party shall also be able to participate in the Sale Hearing at the Court's San Jose Courtroom, in Courtroom 3020, located at 280 South First Street, San Jose, California 95113.

R. **Objections to the Sale Motion**. Objections to the Sale Motion, if any, must: (i) be in writing, (ii) conform to the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the United States Bankruptcy Court for the Northern District of California, San Jose Division (iii) set forth the name of the objector, the nature of the objector's claims against or interests in the Debtor's estate or property, and the legal and factual basis for the objection shall be timely filed with the Court.

The Debtor's management believes that establishing uniform procedures for bidding on the Purchased Assets will allow the Debtor and the Court to review promptly, analyze and compare all bids, if any, received to determine which bid, if any, is in the best interest of the Debtor's estate. Additionally, the Debtor believes proposed Sale Procedures are fair and equitable.

## III.

## GOOD CAUSE EXISTS TO APPROVE THE SALE PROCEDURES

As set forth in the Koontz Declaration, the Debtor believes that the sale procedures set forth above are reasonable. In the context of bankruptcy, sales such as the pending transaction between the Debtor and the Stalking Horse Bidder become even more challenging, due in part to a debtor's duty to maximize the value of estate assets and the obligation to encourage competitive bidding in order to achieve the highest and best price. It is clear that few potential buyers of the Purchased Assets would be willing to enter into a purchase agreement in the context of a bankruptcy proceeding without some assurance that the bidding process will be fair and equitable and will treat all parties equally. In this regard, initial overbids of up to twenty percent of the sale price have been approved by bankruptcy courts. See *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992) (refers to initial overbid of 22% of sale price); but see *In re Canyon P'ship*, 55 B.R. 520 (Bankr. S.D. Cal. 1985) (approved overbid of $20,000 was 3% of sale price of $662,000).

In this instance, the Debtor believes that the proposed sale and bid procedures are fair and equitable, and treat all parties equally. Moreover, as set forth in the Koontz Declaration, the amount of the initial overbid in this case – [$TBA], or approximately [TBA] of the total Purchase Price of [$TBA] – falls within the limits set by bankruptcy courts. Moreover, subsequent overbids in increments of [$TBA] equals only approximately [TBA%] of the Purchase Price. Based upon the foregoing, the Debtor respectfully requests that the Court approve the Sale Procedures outlined above.

///
///
///
///
///
///
///

# IV.

## THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT SHOULD BE APPROVED

Aside from the proposed Sale Procedures, the Stalking Horse Bidder has required a Break-Up Fee and Expense Reimbursement in the event that the Stalking Horse Bidder is not the Successful Bidder and ultimate purchaser of the Purchased Assets. Of significant import is the fact that the Break-Up Fee and Expense Reimbursement will be paid only if the closing of the Sale to the Stalking Horse Bidder does not occur because the Stalking Horse Bidder is not the Successful Bidder. As discussed below, the Debtor believes that the Break-Up Fee and Expense Reimbursement are fair and reasonable and should be approved.

In scrutinizing break-up fees or topping fees, bankruptcy courts typically employ a dynamic case-by-case approach developed for analyzing break-up fees whereby a court "... must take into consideration what is in the best interests of the estate." See *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); see also, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (standard for approval of break-up fees is whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike."); *In re Hupp Indus., Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (the proposed break-up fee must be carefully scrutinized to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected); Mark F. Hebbeln, *The Economic Case for Judicial Deference to Break-Up Fee Agreements in Bankruptcy*, 13 Bankr. Dev. J. 475, 502-505 (1997) (unless the court determines that a break-up fee arrangement is tainted with self-dealing, fraud, or bad faith, courts should accord "substantial deference" to the fiduciary duty of the debtor's board members who approved the terms of the break-up fee).

Break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule. See *In re Integrated Res., Inc.*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992) citing *Cottle v. Storer Commc'ns, Inc.*, 849 F.2d 570 (11th Cir. 1988) ($29 million termination fee protected by business judgment rule); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988) (break-up fees not illegal when they enhance rather than hamper bidding). While few courts have addressed the validity of break-up fees in bankruptcy, the court in the

*Integrated Resources* case, *supra*, found that courts addressing this issue have routinely asked the following questions:

> **First**, is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation such that the business judgment rule should not be applied? A court will uphold a decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested directors or other means. *In re Integrated Res., Inc.*, *supra*, at 657.
>
> **Second**, does the fee materially hamper bidding? In assessing the incentive or effect of a break-up fee, the court should determine whether the amount of the break-up fee is so substantial that it has a "chilling" effect. *Id.*, at 660.
>
> **Third**, is the amount of the fee unreasonable relative to the proposed purchase price? A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort and expenses of the prospective purchaser. Id., at 662 (the court heard expert testimony that "the average break-up fee in the industry is 3.3 percent [of the purchase price]").

As set forth in the Koontz Declaration, no "self-dealing" or manipulation exists with respect to the Sale. The Debtor has been intensively marketing its assets. The proposed Sale transaction is being negotiated at arms'-length, with each party being represented by separate counsel, and is fair and reasonable, particularly given the Debtor's financial condition and the circumstances of this case. The Stalking Horse Bidder is negotiating the Break-Up Fee and Expense Reimbursement simply to compensate itself for the out of pocket expenses it has incurred while the bidding process unfolds, and its costs and expenses in the event it is unable to acquire the Purchased Assets.

The Debtor believes that the ultimate agreed amount of the Break-Up Fee and Expense Reimbursement is reasonable as a reflection of the risk, effort and expense incurred by the Stalking Horse Bidder in negotiating the terms of the Sale. Given the magnitude of the transaction, the Break-Up Fee and Expense Reimbursement will not result in a "windfall" to the Stalking Horse Bidder. Additionally, the Debtor believes that the Break-Up Fee and Expense Reimbursement: (1) encouraged the making of the Stalking Hose Bidder's initial "stalking horse" offer at a point in the Debtor's Chapter 11 case when the Debtor needed to sell its assets; (2)

may discourage a bidding strategy designed to hold back competitive bids until late in the process; (3) aided the Debtor in negotiating an initial bid that may be the Stalking Horse Bidder's highest bid; (4) may establish a high floor early in the bidding process; and (5) has enhanced the bidding process by creating momentum towards the consummation of a sale.

Based upon the foregoing, the Debtor respectfully requests that the Court approve the Expense Reimbursement as set forth above.

## V.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief requested herein.

DATED: October 15, 2015      POLIS & ASSOCIATES
                             A PROFESSIONAL LAW CORPORATION

                             By:    /s/ Thomas J. Polis
                                 Thomas J. Polis, Esq.
                                 Special Litigation Counsel for Debtors, Santa Cruz Berry Farming Company, LLC and Corralitos Farms, LLC